(No. 33907.—■■■■■■■■■■)

JOHN LAMCZYK *et al.*, Appellees, *vs.* W. O. ALLEN *et al.*, Appellants.

*Opinion filed May 23, 1956.*

CRAIG & CRAIG, of Mattoon (J. E. HORSLEY, of Mattoon, and D. E. FURNALL, of Mt. Vernon, of counsel,) for appellants.

HILL & DOLAN, of Mt. Vernon, (MARTIN J. DOLAN, of Mt. Vernon, and ROBERT S. HILL, of Benton, of counsel,) for appellees.

Mr. JUSTICE MAXWELL delivered the opinion of the court:

From a decree of the circuit court of Washington County declaring a certain oil and gas lease a cloud on the title to plaintiffs' land, defendants, as assignees of the original lease, appeal. The original lease was executed November 15, 1946, by plaintiffs Lamczyk with the Ohio Oil Company as lessee. Additional plaintiff Wood has another oil and gas lease executed by the Lamczyks November 29, 1954, concerning the same land. Briefly stated, it is plaintiff's contention that the Ohio Oil lease terminated by its own provisions. Defendants contend the lease is still in force under the factual circumstances.

Paragraph 3 of the lease in question provided for a primary term of five years and as long thereafter as oil, gas, casinghead gas, casinghead gasoline, or any of them could be produced from the premises, unless surrendered by lessee as provided in the lease. Paragraph 5 required lessee to pay lessor $150 per year for gas from each well when gas was found while being sold or used off the premises; if gas only was found lessee was to pay $50 per year per well where the gas was not used or sold and while this royalty was paid such well was considered as a producing well under paragraph 3. Then paragraph 7 provided if drilling operations were not commenced on or before November 15, 1947, the lease was terminated unless lessee paid $80 on or before said date, which kept the lease alive for another twelve-month period—lessee could extend its time for drilling for successive annual period by payment of the delay rentals. The drilling of a dry hole, by paragraph 9, terminated the lease unless within 60 days drilling operations for another well were commenced or unless there was a resumption of the delay rental payments.

Paragraph 15 provided: "If, within the primary term of this lease, production on the leased premises shall cease from any cause, other than those expressly set forth in Paragraphs 16 or 17 hereof, this lease shall not terminate, provided production shall be resumed or operations for the drilling of a well shall be commenced before or on the next ensuing rental paying date; or, provided lessee begins or resumes the payment of rentals in the manner and amount hereinbefore provided. If, after the expiration of the primary term of this lease, production on the leased premises shall cease from any cause, other than those expressly set forth in Paragraphs 16 and 17 hereof, this lease shall not terminate, provided production shall have been resumed or operations for drilling a well commenced within sixty (60) days from such cessation, and this lease shall remain in force during the diligent prosecution of such operations and, if production results therefrom, then as long as production continues in the manner provided for in this lease."

Paragraph 16 provided: "If, after production has been obtained, operations under this lease are delayed, interrupted or prevented by acts of God, fire, riots, wars, strikes, inability to obtain equipment due to governmental order or action, or by failure of carriers to transport equipment, or by regulation by State or Federal action, this lease shall not terminate or be forfeited and no right of damages shall exist against lessee by reason thereof, provided operations are commenced or resumed within a reasonable time after removal of such cause or causes. If at any time within three months prior to the expiration of the primary term of this lease, production has not been obtained and the commencement or continuance of operations for the drilling of a well on said lands is delayed or prevented by any of the causes mentioned in this paragraph, the said primary term and all other terms of this lease may be extended for successive periods of time while such cause or causes exist, by continuing the payment or tender of delay rentals in

the manner and amount and for the periods of time as provided in Paragraphs 7 and 8 of this lease for deferment of the commencement of drilling operations during the said primary term."

Paragraph 17 provided: "It is further agreed that during any period of overproduction the lessee may curtail production and prorate runs from said lands on a basis equal to any curtailment or proration in effect on adjoining lands, or in compliance with any proration order issued by any governmental authority. Operations hereunder may be suspended or discontinued during such time as the price of oil produced from said lands shall be less than 75 cents per barrel at the well, or for such time as there shall be no reasonable market for the oil and/or gas that may be produced from said lands, and this lease shall not terminate or be forfeited and no right of damages shall exist by reason of such suspension or discontinuance, provided operations are resumed within a reasonable time after removal of such cause."

Paragraph 19 provided: "It is agreed that this lease shall never be forfeited or cancelled for failure to perform, in whole or in part, any of its implied covenants, condition, or stipulations, until it shall have been first finally judicially determined that such failure exists, and after such final determination, lessee is given a reasonable time therefrom to comply with any such covenants, conditions, or stipulations."

In January, 1948, Ohio Oil assigned to defendant Allen, who, with the other defendants Mabee and Galbreath, stands in the position of the Ohio Oil Company. Allen operated the Lamczyk lease and in 1947 acquired eight oil and gas leases on contiguous tracts. Between September 1947 and September 1948 he drilled eight wells in this block. The fifth well was on the Lamczyk lease in November 1947. These wells, plus two other dry holes drilled by Allen in the same area, comprised ten test wells in that field. The

eight producers were completed as gas wells with the exception of the discovery well on adjoining land. There was considerable testimony as to the capacity, pressure, potential and price of gas concerning this Lamczyk well. In addition, Allen testified to lengthy negotiations respecting his attempt to market this gas. The Lamczyk well was capped and has so remained. Defendants made no payments to plaintiffs. The bill to remove the cloud on plaintiffs' title was filed February 4, 1955, and alleged defendants' failure to make any payments under the lease and charged that the lease terminated and lapsed by its own terms and conditions. Defendants urge that under Paragraph 17 of the lease they were under no duty to pay the "shut-in" royalty mentioned in paragraph 5 for the reason that suspension in operations was due to nonavailability of a market, and that defendants had diligently sought to remove this cause of suspension.

We have carefully reviewed the evidence in this case and are of the opinion that there is substantial agreement on both sides as to the salient facts. The decision of this case must necessarily rest on the construction of the lease. No good purpose can be served by the recitation and citation of authority. An analysis of the instrument in question must yield the result which best answers the query—what is the intention of the parties as derived from the language employed and is it clear and unambiguous or vague and equivocal? Paragraph 5 providing for the payment of "shut-in" royalties is clear and direct. To keep the lease alive where gas is found and not sold the payment must be made to consider the well as a *producing* well. Paragraph 17 clearly contemplates a condition where there has been *production* of gas together with its delivery and sale but that, due to certain conditions after production, suspension of operations is caused by no reasonable market being available, and provides for resumption within a reasonable time after removal of the cause. In the construction of deeds, wills, contracts and other instruments in

writing the courts seek to ascertain the intention of the parties, and the intention, when found, will be given effect if it is consistent with the language used and with the law and with public policy. *Anderson* v. *Stewart,* 285 Ill. 605; *Bear* v. *Millikin Trust Co.* 336 Ill. 366; *Woods* v. *Seymour,* 350 Ill. 493; *Henry* v. *Metz,* 382 Ill. 297.

We are of the opinion that the lower court's decree was correct and it is hereby affirmed.

*Decree affirmed.*