Fannie WADDLE, Petitioner,

v.

LUCKY STRIKE OIL COMPANY, INC., Respondent.

Supreme Court of Tennessee.

April 18, 1977.

R. L. Johnson, Gainesboro, for petitioner.

John E. Acuff, Crawford, Barnes & Acuff, Cookeville, for respondent.

OPINION

FONES, Justice.

This action was instituted by plaintiff, as lessee, seeking a declaration that an oil and

1. A copy of the lease is appended to this Opinion.

gas lease remains in full force and effect and for other relief. The Chancellor denied the relief sought and the Court of Appeals reversed. We granted the writ of certiorari.

The issues are whether lessee was in default in failing either to drill or to pay delay rental, and, if so, whether the lease terminated by its own terms, without the necessity of "a final determination" of default, followed by a reasonable time within which to comply.

The oil and gas lease was entered into on December 3, 1971, between defendant, Fannie M. Waddle, as lessor, and Mid-Western Petroleum Corporation[1], as lessee. Plaintiff is an assignee of a successor corporation of Mid-Western. John Kramer of New York, Pennsylvania, an officer of the original lessee and of its successor, represented the corporation in the negotiations with lessor, and the lease bears the hand-written notation that it was prepared by him. A "cash bonus"[2] of fifteen hundred ($1,500) dollars was paid for a primary term of ten (10) years.

The obligations imposed upon the lessee by the terms of the lease that involve the issue of termination follow:

(1) " . . . this lease shall terminate . . . unless . . . lessee shall . . . " begin operations for the drilling of a well within six months of December 3, 1971, or pay $75 per annum for the privilege of deferring drilling operations;

(2) In the event of a dry hole, or holes, prior to the discovery of oil or gas, " . . . this lease shall not terminate, provided . . . " operations for the drilling of a well were commenced, or $75 per annum paid, as delay rental, by the next rental paying date;

(3) If production ceased for any cause, " . . . this lease shall not terminate, provided . . . " operations for the

2. Oil and gas lease terminology for one of the three (3) usual sources of revenue to the lessor. The other two (2) are "delay rental" and "royalty." Kulp, *Oil and Gas Rights*, (1954) § 10.36.

drilling of a well were commenced or $75 per annum paid, as delay rental, by the next rental paying date;

(4) To pay $50 damages before drilling each well.

Lessee drilled well number one on lessor's land within six (6) months of December 3, 1971. It disclosed traces, but no commercial oil, and was declared a dry hole and plugged. A few months later well number two was drilled and "demonstrated a surplus of oil" sufficient to cause lessee to go forward with the installations necessary to begin commercially pumping oil. However, the Tennessee Oil and Gas Board "red-tagged" the well before any oil was pumped. According to Kramer, the drilling contractor encountered a boulder, and moved the location of the well twenty-one (21) feet "in the middle of the night." Instead of being moved west, it was moved south and east, too close to property owned by Wesley Flatt, Jr. and others, in violation of State regulations. Kramer's interpretation of the consequences of a well too close to adjoining property was that, if the owner of more than a fifty (50%) percent interest therein would not consent to removal of the red-tag, a hearing before the State Board could be requested and "it has been their custom to allow you to pump it."

Kramer's only explanation of why the red-tag had not been removed, or of lessee's efforts to do so was the following:

"Well, we've been putting out a lot more brush fires like this in between, and it is not the next logical step. We attempted to get it from Wesley Flatt, if that's what you're asking."

Parenthetically, the record reveals that Kramer's corporation had a fifty (50%) percent interest in an oil lease on the Flatt property, and plaintiff corporation also procured an assignment of that lease. No further details of that transaction were developed, nor does either party assert that it had any impact on the issues in this litigation.

On March 8, 1974, lessee[3] assigned its interest in the Waddle oil and gas lease to plaintiff, Lucky Strike Oil Company, Inc. in consideration of ten thousand ($10,000) dollars.

Fred Hull, President and owner of plaintiff corporation, and Ray Bostick, who was representing John Kramer, called on Mrs. Waddle at her daughter's home on March 13, 1974. Hull testified they went, "to see where [sic] she objected." She informed them, in essence, that the lease was terminated because Mr. Kramer had not done what he had promised. They returned the following day, and either handed her or merely left on a table with other papers a Bank of Celina receipt showing a deposit of two hundred fifty ($250) dollars to the credit of lessor. Lessor testified that she did not learn of the deposit until after they had left. Under date of March 15, 1974, her check for two hundred fifty ($250) dollars payable to plaintiff was mailed with a covering letter stating in part, that: "My lease is out and I do not want to lease again."

No further drilling was commenced on lessor's property after November 27, 1972, and no delay rental was paid lessor until the deposit to her account on March 14, 1974. Hull and Bostick had slightly different versions of what the sum of two hundred fifty ($250) dollars represented. Kramer said that it represented two years delay rental and fifty ($50) dollars damages or "clean-up" for each of the wells drilled on lessor's property. As a witness, Kramer insisted that nothing was due lessor, because the lease was "held by production," and that lessee was entitled to notice or a "determination" and reasonable time thereafter to pay rental or "to do whatever is wrong [sic]."

Defendant insists that the lease terminated by its own terms when lessee failed to

---

3. A successor corporation of Mid-Western Petroleum Corporation, Bon-Terre Petroleum Corporation, was the assignor.

drill or to pay delay rental after well number two was red-tagged.

In this Court, plaintiff relies entirely on the reasoning of the Court of Appeals.

The Court of Appeals was of the opinion that the only specific obligation imposed on the lessee was that either of commencing operations for digging a well within six (6) months or of paying seventy-five ($75) dollars per year; that having drilled a well within six (6) months the rights of the lessee were fixed without further payment for a period of ten (10) years.

We disagree with that interpretation.

■ First, we agree with the majority of courts that have passed upon the term "production" in this context, and hold that it is equivalent to the phrase "production in paying quantities" and also embraces the ability to market the product at a profit. See *Gulf Oil Corporation v. Reid*, 161 Tex. 51, 337 S.W.2d 267 (1960); W. Summers, *Oil and Gas* (1959) § 293.

Thus, in our opinion, well number two is in the same category as a dry hole as long as the red-tag placed thereon, prior to any pumping or production, remains in force.

■ The dry hole clause of this lease is prefaced by the phrase, "if at any time prior to the discovery of oil or gas . . ." It is a fact, under this record, that oil, in apparent commercial quantities, was discovered on lessor's land. But, we are not disposed to allow that expression to thwart what we believe to be the obligation of the lessee under the terms of this lease. In *Mountain States Oil Corporation v. Sandoval*, 109 Col. 401, 125 P.2d 964 (1942), the Supreme Court of Colorado, quoted the following from its earlier opinion in *Lanham v. Jones*, 84 Col. 129, 268 P. 521 (1928): " . . . instruments of this character are construed most favorably to development, . . . time is the essence of the contract, and the real motive for the giving of such instruments is the development of the leased property. Therefore such a lease or option is properly construed strongly against the lessee, so as to secure such speedy development." 125 P.2d at 967.

■ We approve that statement, and as applied to this lease are of the opinion that it requires a construction that lessee on the next ensuing rental date after the red-tagging on November 27, 1972, was required either to commence drilling another well, to pay delay rental or to remove the red-tag and bring well number two into production in paying quantity. Upon failing to do so the lease terminated by its own terms.

It may very well be that upon a showing of good faith effort by the lessee to remove the red-tag, equitable consideration would sanction deferring the due date of these obligations, where, as here, the event that triggered them was only a few days prior to the annual rental date. However, there is no justification whatever in this record for that relief. A second annual rental date passed on December 3, 1973, and three additional months, before lessee attempted to pay delay rent. The only other evidence of any effort to perform was Kramer's statement that Flatt's permission was sought, which presumably would have caused the State Oil and Gas Board to remove the red-tag.

The Court of Appeals held that "the mere statement of the lease that it *shall not terminate* if certain conditions are met does not mean that it *shall* terminate (automatically) if the conditions are not met."

■ An oil and gas lease is subject to the well established rule that in the construction of contracts, wills, deeds and other instruments in writing, the court seeks to ascertain the intention of the parties from the language used. *Lamczyk v. Allen*, 8 Ill.2d 547, 134 N.E.2d 753 (1956). While it may be preferred draftsmanship to state

termination clauses in the affirmative, we are of the opinion that the meaning of the language used, and thus the intention of the parties, is the same, and if the conditions expressly provided to avoid termination are not performed, then termination is the result, whether the language used is, "this lease shall not terminate, provided . . . ." or "this lease shall terminate, unless . . . ."

This brings us to a consideration of the effect of the following provision of the lease, said by plaintiff and the Court of Appeals to prevent termination:

"It is agreed that this lease shall never be terminated, forfeited, or cancelled for failure to perform in whole or in part, any of its implied covenants, conditions or stipulations, until it shall have been first finally determined that such failure exists, and after such final determination, lessee is given a reasonable time therefrom to comply with any such covenants, conditions or stipulations."

Implied covenants against the lessee comprise an important phase of the law of oil and gas. While there is some difference of opinion as to the best classification of these implied covenants, Merrill and Kulp discuss the legal problems involved under the following descriptive titles: (1) to drill an exploratory well; (2) to drill off-set wells; (3) to drill additional wells during and after the exploratory period; and (4) to diligently operate and market. M. Merrill, *Covenants Implied in Oil and Gas Leases,* (2nd ed. 1940) § 4 Kulp, *Oil and Gas Rights* (1954) §§ 10.66–10.71.

■ The provision quoted above, and others of similar import, are designed to give lessees relief from the legal effects of these implied covenants in oil and gas leases. We are cited to no authority and our independent research has disclosed none, holding that this provision has any relevance to a default in the obligation to drill or to pay delay rental under specific conditions set forth in the lease.

The validity of such a provision, where the issue is the performance by lessee of one of the implied covenants of an oil and gas lease, is questionable.

In *Frick-Reid Supply Corporation v. Meers,* 52 S.W.2d 115 (Tex.Civ.App.1932), a similar no forfeiture or termination clause until "a final judicial ascertainment" was held void and unenforceable. See also *Lamczyk v. Allen,* supra; *Guerra v. Chancellor,* 103 S.W.2d 775 (Tex.Civ.App.1937); *Mountain States Oil Corporation v. Sandoval, supra; Clovis v. Carson Oil & Gas Co.,* 11 F.Supp. 797 (E.D.Mich.1935); *Melancon v. Texas Company,* 230 La. 593, 89 So.2d 135 (1956); and *Smith v. Sun Oil Co.,* 172 La. 655, 135 So. 15 (1931).

We conclude that this lease required lessee to drill, to pay delay rental, or to be in production in paying quantities on the "rental paying date[s]," or the lease terminated by its own terms. Under the facts of this case, the no termination or forfeiture clause has no application to those obligations.

The judgment of the Court of Appeals is reversed and the decree of the Chancery Court of Clay County, Tennessee dismissing the plaintiff's suit is affirmed. Costs are adjudged against plaintiff, Lucky Strike Oil Company.

COOPER, C. J., and HENRY, BROCK and HARBISON, JJ., concur.

129-11

88 (REVISED)　(FORM 209)

# OIL AND GAS LEASE

THE STATE OF TENNESSEE,

COUNTY OF _CLAY_ }　**Know all Men by These Presents:**

That This Agreement, Made and entered into this _3RD_ day of _DECEMBER_, 19_21_

by and between _FANNIE M. WADDLE or (WADDLE)_

RT#2.

of _CELINA, TENN_, party of the first part, hereinafter called lessor (whether one

or more) and _MIDWESTERN PETROLEUM CORP_, party of the second part, lessee.

WITNESSETH: That the lessor for and in consideration of _ONE THOUSAND FIVE HUNDRED_ DOLLARS

($ _1500.00_) In hand paid, receipt of which is hereby acknowledged and which payment is received in full satisfaction of each and every right hereby granted, and of the covenants and agreements hereinafter contained on the part of the lessee to be paid, kept and performed, has granted, demised, leased and let and by these presents does grant, demise, lease and let unto said lessee, with the exclusive right to prospect, explore, by lay of core drills or otherwise, to mine, operate, produce, store and remove therefrom oil, gas, casinghead gas, and all petroleum products and to build tanks, powerhouses, such other houses necessary for convenience of employees, stations, and structures thereon to produce, save and take care of and manufacture all of such substances together with rights-of-way, easements and servitude for pipe lines, telephones, and telegraph lines, with the right for such purposes to the free use of oil, gas, or water from said land, but not from lessor's water wells or ponds, without lessor's written consent, with the right of removing, either during, or after the term hereof, all and any improvements placed or erected on the premises by the lessee, including the right to pull all casing, together with the right of ingress and egress at all times,

all that certain tract of land situated in the _3RD_ District, County of _CLAY_ State of Tennessee, described as follows, to-wit:

Bounded on the north by the lands of _WILBUR J. LANGFORD_

Bounded on the east by the lands of _WESLEY FLATT JR._

Bounded on the south by the lands of _BROWN + PHILLIPS._

Bounded on the west by the lands of _PHILLIPS._

and containing _300_ acres, more or less, including lands conveyed to lessor by _R.W. BARLOW LANGFORD._

by deed dated _SEPT. 11, 1948_ and recorded in said County records in Deed Book _9_ Page _317_
(Lessee or assigns may refer to said records for a more particular description of said land.) In the event a resurvey of said lands shall reveal the existence of excess and/or vacant lands lying adjacent to the lands above described and the lessor, his heirs, or assigns, shall, by virtue of his ownership of the lands above described, have preference right to acquire said excess and/or vacant lands, then in that event this lease shall cover and include all such excess and/or vacant lands which the lessor, his heirs, or assigns, shall have the preference right to acquire by virtue of his ownership of the lands above described as and when acquired by the lessor; and the lessee shall pay the lessor for such excess and/or vacant lands at the same rate per acre as the cash consideration paid for the acreage hereinabove mentioned.

TO HAVE AND TO HOLD the same for a term of ten (10) years from this date, hereinafter referred to as the primary term, and as long thereafter as oil or gas or casinghead gas, or either or any of them, is produced therefrom, or as much longer thereafter as the lessee in good faith shall conduct drilling operations thereon and should (production) result from such operations, this lease shall remain in full force and effect as long as oil or gas or casinghead gas, shall be produced therefrom.

In consideration of the premises, it is hereby mutually agreed as follows:

1. Lessee shall deliver to the credit of the lessor, as royalty, free of cost, in the pipe line to which it may connect its wells the equal one-eighth (⅛) part of all oil produced and saved from the leased premises.

2. The lessee shall pay lessor, as royalty, one-eighth (⅛) of the net proceeds derived from the sale of gas from each well, where gas only is found, while the same is being sold or used off the premises, and in this event settlement shall be made by lessee on or before the 20th day of each calendar month for gas sold during the preceding month, but nothing in this agreement contained shall require lessee to save or market gas from said lands unless there shall be a surplus above fuel requirements and a market at the well for the same. The lessor to have gas free of charge from any gas well on the leased premises for all stoves and inside lights in the principal dwelling house on said land by making his own connection with the well, the use of said gas to be at the lessor's sole risk and expense at all times.

3. The lessee shall pay to the lessor for resoline or other products manufactured and sold by the lessee from the gas produced from any oil well, as royalty, one-eighth (⅛) of the net proceeds from the sale thereof, after deducting cost of manufacturing the same. If said gas is sold by the lessee, the lessor shall receive as royalty one-eighth (⅛) of the market value in the field of such gas.

If operations for the drilling of a well for oil or gas are not commenced on said land on or before _SIX MONTHS_ from this date, this lease shall terminate as to both parties, unless the lessee shall, on or before ___ (expires from this date, pay or tender to the lessor or for the lessor's credit in the _BANK OF CELINA_ Bank at _CELINA, TENN_ or its successors, which bank and its successors are the lessor's agent and shall continue as the depository of any and all sums payable under this lease, regardless of changes of ownership in said land or in the oil and gas, or in the rentals to accrue thereunder, the sum of _SEVENTY-FIVE_ DOLLARS ($ _75.00_), which shall operate as rental and cover the privilege of deferring the commencement of drilling operations for a period of one year. In like manner and upon like payments or tenders, the commencement of drilling operations may be further deferred for like periods successively during the original term of this lease as fixed in the habendum clause hereof. All payments or tenders may be made by check or draft of lessee or any assignee thereof, mailed or delivered on or before the rental paying date.

SIX MONTHS

Notwithstanding the death of the lessor, or his successor in interest, the payment or tender of rentals in the manner provided above shall be binding on the heirs, devisees, executors and administrators of such persons.

If at any time prior to the discovery of oil or gas on this land and during the term of this lease, the lessee shall drill a dry hole, or holes, on this land, this lease shall not terminate, provided operations for the drilling of a well shall be commenced by the next ensuing rental paying date, or provided the lessee begins or resumes the payment of rentals in the manner and amount above herein provided and in this event the preceding paragraphs hereof governing the payment of rentals and the manner and effect thereof shall continue in force.

In case said lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the bonus, royalties and rentals herein provided for shall be paid the said lessor only in the proportion which his interest bears to the whole and undivided fee.

When required by lessor, lessee shall bury pipe lines below plow depth and shall pay the surface owner or surface tenant for all damages to crops, trees, fences, buildings, and other improvements caused by his operations under this lease. No well shall be drilled nearer than two hundred (200) feet to the house or barn now on said premises without the written consent of the lessor, unless such drilling be necessary for the protection of the interest of either of the parties hereto.

If the estate of either party hereto is assigned (and the privilege of assigning in whole or in part is expressly allowed), the covenants hereof shall extend to their heirs, executors, administrators, successors and assigns, but no change of ownership in the land or in the rentals or royalties shall be binding on the lessee until after notice to the lessee and it has been furnished with the written transfer or assignment or a certified copy thereof.

If the leased premises shall hereafter be owned in severalty or in separate tracts, the premises, nevertheless, shall be developed and operated as one lease and all royalties accruing hereunder shall be treated as an entirety and shall be divided among and paid to such separate owners in the proportion that the acreage owned by each such separate owner bears to the entire leased acreage. There shall be no obligation on the part of the lessee to offset oil or gas wells on separate tracts into which the land covered by this lease may be hereafter divided by sale, devise or otherwise, or to furnish separate measuring or receiving tanks. It is hereby agreed that, in the event this lease shall be assigned as to a part or as to parts of the above described lands, and the holder or owner of any such part or parts shall fail or make default in the payment of the proportionate part of the rent due from him or them, or shall default in any of the obligations imposed upon lessee by this lease, whether expressed or implied, such default shall not affect this lease in so far as it covers a part or parts of said land upon which the said lessee or any assignee thereof shall not be in default. If at any time there be as many as four (4) parties entitled to royalties or rentals, lessee may withhold payment thereof, until and until all parties designate in writing, in a recordable instrument to be filed with the lessee, a common agent to receive all payment due hereunder, and to execute division and transfer orders on behalf of said parties and their respective successors in title.

If within the primary term of this lease production on the leased premises shall cease from any cause, this lease shall not terminate provided operations for the drilling of a well shall be commenced before or on the next ensuing rental paying date, or provided lessee, if it so elects, to commence operations for the drilling of another well, at his election, to commence operations for the drilling of another well, or otherwise, or to furnish separate well, deepen an existing well or wells, or otherwise to attempt to restore the production of such existing well or wells, and if such work is so commenced and prosecuted with reasonable diligence and production results therefrom, this lease shall remain in force so long as production continues.

Lessor hereby warrants and agrees to defend the title to the land herein described and agrees that the lessor, at its option, may pay and discharge any taxes, mortgages, or other liens existing, levied, or assessed on or against the above described lands, and, in the event it exercises such option, it shall be subrogated to the rights of any holder or holders thereof and may reimburse itself by applying to the discharge of any such mortgage, tax or other lien, any royalty or rentals accruing hereunder.

It is agreed that this lease shall never be terminated, forfeited, or cancelled for failure to perform in whole or in part, any of its implied covenants, conditions or stipulations, until it shall have been first finally determined that such failure exists, and after such final determination, lessee is given a reasonable time therefrom to comply with any such covenants, conditions or stipulations.

All payments which may fall due under this lease may be made to _FANNIE M. WADDLE_ one of the above named lessors, in the manner herein stated.

This lease and all its terms, conditions, and stipulations shall extend to and be binding on all successors of said lessor or lessee.

IN TESTIMONY WHEREOF, we sign this instrument the day and year first above written.

LESSEE AGREES TO PAY $50.00 DAMAGES TO FANNIE WADDLE BEFORE DRILLING

Witnesses: _LACH JVELL_

_Ruby Loftis_　　　　　_Fannie Waddle_