P. M. DRILLING, INC.,
Plaintiff–Appellant,

v.

Herbert Q. GROCE and wife, Jennie
Groce, Defendants–Appellees.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Feb. 22, 1990.

Application for Permission to Appeal
Denied by Supreme Court
June 11, 1990.

Phillips M. Smalling, Hassler & Smalling, Byrdstown, for plaintiff-appellant.

Onnie L. Winebarger, Byrdstown, for defendants-appellees.

## OPINION

LEWIS, Judge.

This is an appeal by plaintiff, P. M. Drilling, Inc. (P.M.), from the judgment of the trial court declaring an oil and gas lease between P.M. and the defendants, Herbert Q. Groce and his wife, Jennie Groce, "to be lapsed and of no effect."

The pertinent facts are as follows:

Early in 1987, James C. Perdue, owner of P.M., began discussions with Herbert T. (Herby) Groce concerning the possibility of leasing a tract of land owned by Herby Groce's parents, defendants Herbert Q. and Jennie Groce [1], for oil and gas development. The discussions continued between Perdue and Herby Groce, the latter acting as the Groces' agent throughout the negotiations.

Negotiations began with a standard form Oil and Gas Lease. As the negotiations progressed, Herby Groce suggested that a number of "non-standard" provisions be included in the lease. One non-standard provision which was added to the lease provided that P.M. would "drill wells only during the summer months." This provision was apparently added because of the Groces' concern over potential damage to their property caused by a drilling operation. Another added provision required that P.M. drill the first well within seven months of the execution of the lease rather than within the standard twelve-month period. A third added provision, the meaning of which is at the center of this controversy, deals with the payment to the Groces of a

minimum amount of money per year to lease the land. Perdue and Herby Groce also agreed to insert a ninety-day term in the cessation of production clause of the lease and omit a standard provision that allows the lessee to wait up to twelve months to drill a new well if a dry hole is drilled.

After Perdue and Herby Groce had discussed several drafts of the lease, they came to an agreement on an acceptable version. In order to accommodate the changes in the standard lease, Perdue had his wife type the entire lease. Perdue and the Groces executed the lease on 18 April 1987 and P.M. paid the Groces a $1,000 initial payment on or near that date.[2]

In November 1987, P.M. completed drilling operations on the first well on the Groces' property. Gas was sold from the well in January and February of 1988 and P.M. sent the Groces two royalty checks, one in the amount of $39.72, designated as being for gas production in January 1988, and the other in the amount of $23.83 for gas production in February 1988. Both checks were negotiated by the Groces. A third check dated 11 July 1988 was sent by P.M. and received by the Groces sometime after the other checks. That check was for $32.03 and was designated as being for "estimated gas production" from 30 May 1988 to 30 June 1988. The Groces returned that check to P.M., and P.M. tendered $32.03 to the trial court pending disposition of the lawsuit filed by P.M. on 29 August 1988.

P.M. sold no gas from the well after February 1988. The Groces apparently became concerned that the well was not actively producing gas. On 7 June 1988, the Groces' attorney sent a letter to Perdue expressing their position that the lease had expired under the terms and conditions of the lease. Thereafter, the parties exchanged several letters disputing the force and effect of the lease. About the time the Groces received and returned the third royalty check, dated 11 July 1988, Herby

---

1. Hereafter, Herbert Q. and Jennie Groce will be referred to as "the Groces" to the exclusion of Herby Groce.

2. Although the lease states that the consideration for the lease was to be $10, it was stipulated that the parties agreed to a $1,000 payment.

Groce put up "no trespassing" signs on the leased property. Thereafter, P.M. did not access the leased property.

On 29 August 1988, P.M. filed suit against the Groces alleging that the lease was still in full force and effect and asking that P.M. be allowed access to the lease-hold premises. The Groces answered that the lease had expired under its terms and counterclaimed for a declaration that the lease had indeed expired and for removal of P.M.'s drilling equipment from the Groces' property. On 29 September, P.M. tendered $947.99 to the trial court representing the difference between the $1,000 minimum payment provided in the lease and the $63.55 previously paid to the Groces as royalties, together with interest on the balance from and after 18 April 1988, the anniversary date of the lease, to the date of tender. P.M. had earlier tendered $32.03 to the court for the royalty payment rejected by the Groces.

A bench trial was held on 23 March 1989. On 23 June 1989, the trial court entered a judgment which provided that the lease had expired prior to 7 June 1988 and that P.M. should remove its drilling equipment from the Groces' property.

P.M. presents a single issue: "Whether an oil and gas lease entered by the parties on April 18, 1987, was in full force and effect on June 7, 1988, when repudiated by the Defendants."

In reply to this issue, the Groces argue (1) that "the trial court correctly [found] that some production was required to keep the lease in effect under the habendum clause as set out in the lease;" (2) that "the trial court correctly [found] that the Lessee, P.M. Drilling, Inc.'s rights under the lease under the production cessation clause to commence drilling a well expired within ninety (90) days of when production stopped in the primary term;" and (3) that "the trial court correctly [found] that the lease had expired under its own terms on or before June 7, 1988, the date the defendants announced and treated the lease as being expired under its own terms."

The Groces' first argument hinges on the effect to be given to that provision in the lease referred to by the parties as the "double asterisk" provision. The "double asterisk" provision and the habendum clause from which it is referred provides as follows:

TO HAVE AND TO HOLD THE SAME FOR A TERM OF ONE YEAR FROM THIS DATE, HEREINAFTER REFERRED TO AS THE PRIMARY TERM, AND AS LONG THEREAFTER AS OIL OR GAS OR CASINGHEAD GAS, OR EITHER OR ANY OF THEM, IS PRODUCED THEREFROM **, OR AS MUCH LONGER THEREAFTER AS THE LESSEE IN GOOD FAITH SHALL CONDUCT DRILLING OPERATIONS THEREON AND SHOULD PRODUCTION RESULT FROM SUCH OPERATIONS, THIS LEASE SHALL REMAIN IN FULL FORCE AND EFFECT AS LONG AS OIL OR GAS OR CASINGHEAD GAS, SHALL BE PRODUCED THEREFROM.

** LESSOR SHALL RECEIVE AT LEAST $1,000.00 PER YEAR ROYALTY PAYMENT OR FROM LESSEE, IN ORDER TO BE CONSIDERED "PRODUCTION".

In *Waddle v. Lucky Strike Oil Co.*, 551 S.W.2d 323 (Tenn.1977), our Supreme Court addressed a dispute over the meaning of an oil and gas lease. Justice Fones, writing for the Court, stated as follows:

An oil and gas lease is subject to the well established rule that in the construction of contracts, wills, deeds and other instruments in writing, the court seeks to ascertain the intention of the parties from the language used.... [W]e are of the opinion that the meaning of the language used, and thus the intention of the parties, is the same, ...

*Id.* at 326–27 (citation omitted).

Here, we find the terms of the oil and gas lease to be unambiguous. Therefore, we will determine the intent of the parties from the language expressed within the four corners of the lease.

The Groces argue that the trial court was correct in finding that some *actual* production of the well was required to

"keep the lease in effect under the habendum clause." We disagree and find that the habendum clause does not require actual production for either the primary term or any time thereafter.

■ Under the plain meaning of the habendum clause there is no requirement for production whatsoever during the primary term. The language of the habendum clause clearly states that the lessee shall have the use of the land "FOR A TERM OF ONE YEAR FROM THIS DATE, HEREINAFTER REFERRED TO AS THE PRIMARY TERM, *AND* AS LONG THEREAFTER AS OIL OR GAS ... IS PRODUCED THEREFROM." (Emphasis supplied). The habendum clause does not set out any qualification for production during the primary term and the fact that actual production stopped during the primary term has no effect on the validity of the lease under that clause.

■ We also find that there is no requirement under the habendum clause for actual production during the secondary term. Although the standard habendum clause requires either discovery or actual production of oil and gas to cause the lease to remain in effect beyond the primary term, 2E Kuntz, *A Treatise on the Law of Oil and Gas* § 26.5 (1989) (hereinafter Kuntz), that requirement is modified by the double asterisk provision in the lease. The double asterisk provision modifies the habendum clause to provide that production during the secondary term exists as long as the lessors receive "AT LEAST $1,000.00 PER YEAR ROYALTY PAYMENT OR FROM LESSEE."

This provision can have no other meaning than that P.M. must pay the Groces at least $1,000 in production royalties and make up any difference out of P.M. funds if the royalties total less than $1,000.

**3.** P.M. represented the $947.99 as the difference between the minimum payment and the January and February 1988 royalty checks plus interest for and after 18 April 1988 to the date of tender. However, this was incorrect since the royalty checks for January and February were for gas produced during the primary term and the $1,000 minimum payment requirement under the double asterisk provision only applied to

The lease did not expire under the habendum clause. The habendum clause did not impose any requirement on P.M. to keep the lease in effect during the primary term.

■ However, P.M. was required under the habendum clause to pay the Groces at least $1,000 every year of the secondary term in production royalties and to make up the difference if production royalties did not total that amount. The first year of the secondary term began on 18 April 1988. Because it was impossible for P.M. to know how much, if any, it would have to supplement the production royalty total during the first secondary term, P.M. had until 17 April 1989 to comply with the double asterisk provision of the habendum clause. The lease was repudiated prior to that date, and P.M. tendered $947.99 into court during the pendency of this suit in an attempt to meet the requirements of the double asterisk provision.[3]

P.M. did all that was required to meet the terms of the habendum clause and the holding of the trial court that the lease expired under the habendum clause for lack of actual production is reversed.

We find the Groces' first argument to be without merit.

The Groces next argue that "[t]he trial court correctly found that P.M. Drilling, Inc.'s failure to commence drilling a well within ninety (90) days after its cessation of production in February, 1988, terminated P.M. Drilling, Inc.'s rights under the production cessation clause." We agree.

The "production cessation clause" provides as follows:

IF WITHIN THE PRIMARY TERM OF THIS LEASE PRODUCTION ON THE LEASED PREMISES SHALL CEASE FROM ANY CAUSE, THIS LEASE SHALL NOT TERMINATE

secondary term years. Because P.M. also tendered $32.03 to the court representing the check refused by the Groces for "estimated gas production" between 30 May 1988 and 30 June 1988 (part of the secondary term), P.M.'s tender to the court was $19.98 short. We find this not to be fatal to P.M. in light of P.M.'s good faith effort to comply with the terms of the lease.

PROVIDED OPERATIONS FOR THE DRILLING OF A WELL SHALL BE COMMENCED WITHIN NINETY (90) DAYS. IF, AFTER THE EXPIRATION OF THE PRIMARY TERM OF THIS LEASE, PRODUCTION ON THE LEASED PREMISES SHALL CEASE FROM ANY CAUSE, LESSEE SHALL HAVE THE PERIOD OF NINETY (90) DAYS FROM THE STOPPING OF PRODUCTION WITHIN WHICH, AT HIS ELECTION, TO COMMENCE OPERATIONS FOR THE DRILLING OF ANOTHER WELL, DEEPEN AN EXISTING WELL OR WELLS, OR OTHERWISE ATTEMPT TO RESTORE THE PRODUCTION OF SUCH EXISTING WELL OR WELLS, AND IF SUCH WORK IS SO COMMENCED AND PROSECUTED WITH REASONALBE [sic] DILIGENCE AND PRODUCTION RESULTS THEREFROM, THIS LEASE SHALL REMAIN IN FORCE AS LONG AS PRODUCTION CONTINUES.

While under the first argument we held that the lease did not expire under the terms of the habendum clause, the habendum clause is "subject to other provisions contained in the lease which may provide for an earlier or later termination under prescribed circumstances or upon the happening of certain events." 2E Kuntz § 26.1 (1989). "The clauses will vary as to form and may appear alone or in various combinations within any oil and gas lease." 4E Kuntz § 47.1 (1972). One of these clauses is the "production cessation" hereinafter referred to as the cessation of production clause.

The purpose of the cessation of production clause is to "describe the rights of the lessee to resume operations if production should cease." 4E Kuntz § 47.3 (1972).

P.M. contends that because of the double asterisk provision's definition of production the lease did not expire under the cessation of production clause even though actual production ceased. However, we find that the definition of production applicable to the habendum clause as set out in the double asterisk provision is *not* applicable to the term "production" as it appears in

the other portions of the lease. As heretofore mentioned, the habendum clause is subject to and independent of other provisions contained in the lease. It is not unusual in an oil and gas lease for a term in another part of the lease to have a different meaning than it is given in the habendum clause. 2E Kuntz § 26.7(c) (1989).

2E Kuntz § 26.5 (1989) states in part:

The words and phrases contained in the habendum clause of the oil and gas lease are of great importance in that they describe the events which will control the duration of the interest granted. In many cases, the dispute has centered around the meaning of a specific word or phrase contained in the habendum clause. In most such instances, the courts have avoided preoccupation with words and definitions and have considered the essential purposes of the lease and the objectives of the parties. The attempt herein to define certain words and phrases should not be taken as a suggestion that the problems are best solved through reasoning by definition. It is suggested, however, that *where a word has become a word of art and is used in a manner which indicates that such word is used in a technical sense, the word must be given its technical meaning. Where the word has not become a word of art in the jurisdiction involved, then the basic purposes of the lease and the objectives of the parties and not the literal definition of the word should be the subject of inquiry.*

*Id.* (emphasis added).

■ In Tennessee, the term "production" as used in the context of an oil and gas lease has been defined to mean "production in paying quantities." *Waddle v. Lucky Strike Oil Co.*, 551 S.W.2d 323, 326 (Tenn.1977). We find that definition of production to apply to all the provisions of this oil and gas lease except the habendum clause where a different definition was specifically provided at the insistence of the Groces.

■ Since production as used in the cessation of production clause means actual

production "in paying quantities," it is clear that production ceased during the primary term of this lease. The primary term began on 18 April 1987, the date the lease was executed, and did not end until 17 April 1988. The parties stipulated that actual production ended at the end of February 1988. Therefore, we are only concerned with the application of the first sentence of the production clause which provides:

IF WITHIN THE PRIMARY TERM OF THIS LEASE PRODUCTION ON THE LEASED PREMISES SHALL CEASE FROM ANY CAUSE, THIS LEASE SHALL NOT TERMINATE PROVIDED OPERATIONS FOR THE DRILLING OF A WELL SHALL BE COMMENCED WITHIN NINETY (90) DAYS.

This provision in the context of the facts of this case produces a strange result. Here, production ceased because of a lack of market for the gas. The drilling of a new well and discovery of more gas would not have an effect on the marketability of the gas. The only practical effect of the cessation of production clause under the facts of this case would be if the new well produced a discovery of oil and, if that oil proved to be marketable as opposed to the unmarketable gas. Although such a result appears unlikely, we must give effect to the plain language of the lease. *Waddle v. Lucky Strike Oil Co.*, 551 S.W.2d 323, 326–27 (Tenn.1977).

Production of gas in paying quantities ceased at the end of February 1988. P.M. contends that the ninety-day period should not run from that date in light of another provision in the lease. At the Groces' insistence, a non-standard provision was inserted in the lease to provide: "LESSEE AGREES TO DRILL WELLS ONLY DURING THE SUMMER MONTHS." Although the term "summer months" was not defined in the lease, we find that the "summer months" run from 21 June to 22 September. *See Fine v. State*, 153 Fla. 297, ——, 14 So.2d 408, 409 (1943). P.M. argues that if we read the cessation of production clause literally, it would mean

that drilling operations must commence within ninety days after the cessation of production. As a result, P.M. would have had to breach the "summer months" provision in order to conform to the cessation of production clause. This result would follow from the fact that production ceased at the end of February 1988 and the ninety days would have expired on 29 May 1988, twenty-two days before the beginning of the "summer months."

Although the provisions of a contract should be construed in harmony with each other, *Bank of Commerce & Trust Co. v. Northwestern Nat. Life Ins. Co.*, 160 Tenn. 551, 559, 26 S.W.2d 135, 138 (1930), when repugnant clauses cannot be harmonized, one may be disregarded. *See Smithart v. John Hancock Mutual Life Ins. Co.*, 167 Tenn. 513, 525, 71 S.W.2d 1059, 1064 (1934). The general rule is that when two clauses of a contract are repugnant, the first governs rather than the last. *Bean v. Aetna Life Ins. Co.*, 111 Tenn. 186, 190, 78 S.W. 104, 104 (1903). Given that general rule, the "summer months" clause would prevail in this instance since it appears in the lease prior to the cessation of production clause. However, "in cases of instruments irregularly drawn, it is probably more in consonance with authority to say that if clauses of a contract are repugnant, that one which expresses the chief object and purpose of the contract must prevail, while clauses containing provisions subordinate to the chief object and purpose of the contract must give way." *Id.* at 190, 78 S.W. at 105.

The "summer months" drilling clause was added to the lease at the Groces' insistence in order to prevent damage to their land from P.M.'s drilling equipment. We think it is safe to say that in an oil and gas lease the condition of the property must give way to the "chief object and purpose of the contract" as reflected in the cessation of production clause, which is to produce oil or gas in paying quantities.

Without the "summer months" clause, P.M. was required under the cessation of production clause to commence operations for drilling a well within ninety days from

the end of February. This P.M. did not do. As a result, the lease expired under the terms of the cessation of production clause.[4]

▮ Even if the lease had not expired under the cessation of production clause, we find that the lease expired under the terms of another provision.

The shut-in clause of the lease provides as follows:

IN THE EVENT A WELL IS SHUT–IN FOR ANY REASON, LESSEE SHALL HAVE THE RIGHT TO PAY TO THE LESSOR THE SUM OF ONE THOUSAND DOLLARS ($1000.00) WITHIN NINETY (90) DAYS AFTER THE DAY THAT THE WELL IS SHUT–IN, NOT TO EXCEED THREE (3) CALENDAR YEARS, AND WHILE SUCH ROYALTY IS SO PAID SUCH WELL SHALL BE CONSIDERED AS A PRODUCING WELL.

P.M. contends in its brief that the well was never shut-in "under the meaning of the term in this lease." The term "shut-in" is not defined in the lease, and the general definition is "[a] producing well that has been closed down temporarily for repairs, cleaning out, building up pressure, lack of market, etc." 8 Williams and Meyers, *Oil and Gas Law* p. 909 (1987). The record is clear that the well ceased actual production at the end of February 1988 because of the lack of a market for the gas. As such, it was clearly a shut-in well and P.M. was required to pay the agreed shut-in royalty of $1,000 within ninety days in order to keep the lease in effect. P.M. had until 29 May 1988 to pay the Groces the shut-in royalty, and this P.M. failed to do. Such failure caused the lease to expire under the terms of the shut-in clause.

While there are other ways in which this lease might have terminated, we deem it unnecessary to discuss them.

In their third, and final, argument, the Groces contend that the trial court was correct in finding the lease had expired "under its own terms" on or before the Groces repudiated the lease. Based on the foregoing, we agree.

We therefore find P.M.'s sole issue, that the lease was in full force and effect when it was repudiated, to be without merit.

Accordingly, we hold that the oil and gas lease expired under the cessation of production clause when P.M. failed to commence drilling within ninety days after actual production of gas from the well ceased. We also hold the the lease expired under the shut-in clause when P.M. failed to pay the $1,000 shut-in royalty within ninety days from the end of February 1988. We affirm the result reached by the trial court. However, we disagree that the lease at issue expired under the terms of the habendum clause.

It results that for the reasons set out herein the judgment of the trial court is affirmed with costs of this appeal assessed to appellant P.M. Drilling, Inc. and the cause remanded to the trial court for the collection of costs and any further necessary proceedings.

TODD, P.J., and CANTRELL, J., concur.

---

**4.** This result might seem inequitable if P.M. did indeed fail to drill within the ninety-day period because of adherence to the "summer months" clause. However, P.M. is estopped from using that clause as a cloak since P.M. previously violated the "summer months" clause by drilling into the month of November in 1987. *See Murtha v. Pet Dairy Prods. Co.,* 44 Tenn.App. 460, 473, 314 S.W.2d 185, 191 (1959).