IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 14, 2024 Session

## JACKIE L. JONES v. UNREFINED OIL COMPANY, INC., ET AL.

**Appeal from the Chancery Court for Morgan County**
No. 21-16          Tom McFarland, Chancellor

_____

### No. E2023-00272-COA-R3-CV

_____

Upon competing motions for declaratory judgment in this action involving an oil and gas lease, the trial court granted declaratory judgment in favor of the plaintiff, who owned the mineral rights to the real property on which the oil well was located. The court found that although the oil well had been in production as required by the lease, the defendant corporation had failed to comply with the lease's requirement that it make at least one oil sale within a one-year period. The court thereby found that the lease had terminated pursuant to its own terms. The defendant has appealed, and the plaintiff has raised an issue regarding the trial court's finding that the well was in production as required by the lease. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KRISTI M. DAVIS, J., joined.

Donald Capparella and Jacob A. Vanzin, Nashville, Tennessee, for the appellant, Unrefined Oil Company, Inc.

C. Douglas Fields, Crossville, Tennessee, for the appellee, Jackie L. Jones.

### OPINION

#### I. Factual and Procedural Background

The plaintiff, Jackie L. Jones, filed a complaint in the Morgan County Chancery Court ("trial court") on April 22, 2021, requesting a judgment declaring the status of an oil and gas lease and who had the right to operate an oil well. Tennessee Well Permit Number

12271 ("the Well")[1] was located on real property in Morgan County, Tennessee, to which Mr. Jones owned the mineral rights.[2]  Mr. Jones named as defendants Unrefined Oil Company, Inc.; Trapezoidal Global Energy, Inc.; Contango Trading, Inc.; Entrust Tennessee, Inc.; and Salman Energy Investments, LLC (collectively, "Defendants"). According to Mr. Jones's complaint, the instant action arose from a prior action filed in the trial court by Defendants against Outdoor Resources, Inc. ("Outdoor Resources"), "and others" wherein Defendants claimed that they "were holders of the majority interest in [the Well] but were not receiving royalty payments for oil produced from [the Well]."  As a third party to the prior suit, Mr. Jones had asserted that the oil and gas lease had expired or that, alternatively, he was entitled to thirty-percent interest in the net profits of the oil produced.  As part of a settlement reached within the prior action, the oil and gas lease was amended so that Mr. Jones would receive thirty percent of the net profits of oil produced from the Well.

Mr. Jones attached an unsigned copy of the amended lease ("the Amended Lease") to his complaint and presented a copy of the fully executed lease as an exhibit at trial.  The Amended Lease, dated January 9, 2020, was executed by Mr. Jones as the lessor and Outdoor Resources as the lessee and was recorded with the Morgan County Register of Deeds on January 13, 2020.  Outdoor Resources subsequently assigned its seventy-percent interest in the Well to Defendants in varying percentages on January 22, 2020.  The Amended Lease provides in pertinent part:

> 1.    LESSOR, in consideration of Ten ($10.00) Dollars, and other good and valuable consideration, the receipt of which is acknowledge[d], has granted and leased, and by these presents does grant and lease exclusively to the LESSEE, and assigns, the lands described in "Exhibit A" hereto, being Well Permit # 12271, with the exclusive right for producing oil, natural gas and the exclusive right of injecting water, brine, and other fluids into subsurface strata, with the necessary rights-of-way, easements for equipment, pipelines, utilities, etc., for producing, treating and caring for such products, and all other rights and privileges necessary; incident to, or convenient for the

---

[1] In its final judgment, the trial court consistently identified the well permit number as 12271.  However, throughout the record, including in the amended lease at issue, the well permit number is sometimes identified as number 12271 and sometimes as 12771.  The well permit itself is not in the record.  For ease of reference in this Opinion, we have adopted the number utilized by the trial court in its final judgment.

[2] Mr. Jones testified at trial that he had at one time owned the real property on which the Well was located. He had conveyed the real property to his sister, Rhonda Paxton Moreno, who subsequently conveyed a life estate in the mineral rights to Mr. Jones.  As an exhibit at trial, Mr. Jones presented a "Deed for Life Estate in Minerals," dated November 4, 2019, which documented the latter conveyance.

economical operation for the production of the aforementioned products.

2.    This lease shall remain in force so long hereafter that any of the aforementioned products are produced from the leased premises.

3.    LESSOR shall receive as royalty, free of cost, a payment equal to a Thirty (30%) Percent part of all oil and natural gas produced and saved from Well Permit # [12271], said sum to be based upon the market price of said oil and natural gas at the time of the delivery to a purchaser.

4.    The LESSOR shall have natural gas free of charge from the well for use on the leased premises by making his own connections with the well, the uses of such natural gas to be at the LESSOR'S sole risk and expense.  The Well shall not be considered as being in production as that term is used herein merely because landowner is receiving gas from the Well.  For the Well to be in production, it must be actually operating to pump oil from the ground to the storage tank to be in production.

5.    LESSOR currently owns the entire and undivided fee simple estate in the leased premises and shall be paid a Thirty (30%) Percent royalty on all oil produced from said well.

6.    LESSEE shall pay for damages caused to growing crops and fences. LESSEE shall not have the right to remove all machinery and fixtures unless replacing or repairing same or plugging the Well and landowner has not elected to take over the Well under paragraph 7.

7.    IF production shall cease for more than Ninety (90) Days, this lease shall terminate unless the LESSEE is commencing operations for drilling, reworking, treating or deepening the well.  In that case, LESSOR shall be notified and the work shall be completed within Ninety (90) days from the date of such cessation for that work identified, and this lease shall remain in force during the prosecution of such additional drilling, reworking, treating or deepening. Production shall promptly resume after the work is completed and this lease shall continue in effect.  If this lease terminates due to a failure to continue production as set out above, then all improvements to the

Well site shall remain on site for the benefit and responsibility of LESSOR.

In addition to the Well remaining in production, the Well shall produce a minimum of one sale of crude oil per year to continue the lease and LESSOR shall receive payment on oil sold within Ninety (90) days of oil pick-up.

In the event the owners/operators decide to discontinue the Well and plug same, Landowner shall be notified, in writing, and Landowner shall have Ninety (90) days from said written notice to take over the Well and its operation. If Landowner does not do so, the owner/operator may plug the well and this lease will terminate.

8. If the estate of either party is assigned, the covenants hereof shall extend to the successors or assigns, but no change in ownership of the land or assignment of rental or royalties shall be binding upon LESSEE until a written transfer or assignment is furnished, and it is hereby agreed that in the event of assignment, in whole or in part, and the assignee of such parts shall fail to make default in the payment of the proportionate part of rents due from him, such default shall not operate to defeat or affect this lease insofar as it covers a part of said lands which the said LESSEE or assignee thereof shall make due payment of said rental.

(Emphasis added.)

Mr. Jones alleged in his complaint that after Defendants assumed control over the Well in January 2020, they did not have the Well "in production the entire remainder of the calendar year of 2020" and did not "sell the oil that was already in the tank." Mr. Jones averred that "pursuant to paragraph 7 of the lease," he had filed a "Notice of Lease Termination" on December 3, 2020, and recorded it with the Morgan County Register of Deeds. Mr. Jones attached a copy of this notice to his complaint. Mr. Jones stated in the notice that it was based on the alleged cessation of production pursuant to paragraph seven of the Amended Lease. Mr. Jones further alleged in his complaint:

Some time after the Notice of Termination was filed, Defendants, or some of them, or persons on their behalf, did show up at the well site purportedly to do electric work towards starting production, Defendant denied access at that time.

The individuals [who appeared at the site] threatened to sue Mr. Jones and further threatened to remove the pump jack and components even though

- 4 -

paragraphs 6 & 7 state that Lessee shall not have the right to remove machinery and fixtures if landowner takes over the well.

(Paragraph numbering omitted.) Mr. Jones requested that the trial court (1) find Defendants to be in breach of the Amended Lease for failure to maintain production, failure to sell oil, or both; (2) find that the Amended Lease was terminated and that Mr. Jones was the rightful owner with the equipment to remain on his real property; and (3) tax costs to Defendants.

Unrefined Oil Company, Inc. ("Unrefined Oil") filed an answer and counter-complaint on August 13, 2021, denying all substantive allegations against it and raising affirmative defenses of failure to state a claim upon which relief could be granted and unclean hands. In its counter-complaint, Unrefined Oil alleged that since it took over operation of the Well, Mr. Jones had "interfered with the oil and gas lease by harassing the operator and its employees who maintain and work on the well"; denied Unrefined Oil's employee, Ronnie D. Stephens, entry onto the property where the Well was located; and caused Barrett Oil Company ("Barrett") to refuse to pick up "the oil that [had] been pumped into the tank until they have proof from the court who the operator is." Unrefined Oil requested that the trial court (1) declare the Amended Lease "active, valid and binding"; (2) temporarily and permanently enjoin Mr. Jones from interfering with the Amended Lease; (3) temporarily allow Barrett to pick up the oil that was in the tank; (4) hold proceeds from sale of the oil in trust; (5) award to Unrefined Oil "all costs associated with rewiring the oil off well and damages in an amount to be proven at trial"; and (5) tax costs to Mr. Jones.

On September 23, 2021, Mr. Jones filed an answer to the counter-complaint, admitting that Barrett would "not pick up the oil while there is a controversy absent an agreement to do so between the parties" and admitting that he had refused Mr. Stephens access to the Well site while denying that he knew Mr. Stephens's employment status. Mr. Jones denied all other substantive allegations against him. He raised affirmative defenses of failure to state a claim upon which relief could be granted and lack of standing predicated on his assertion that Unrefined Oil no longer held an interest in the Well.

On November 29, 2021, Mr. Jones filed a motion for default judgment against two defendants: Entrust Tennessee, Inc. ("Entrust") and Salman Energy Investments, LLC ("Salman"). Mr. Jones concomitantly filed a motion for service by publication against the two remaining defendants: Trapezoidal Global Energy, Inc. ("Trapezoidal") and Contango Trading, Inc. ("Contango"). The trial court entered an order granting default judgment to Mr. Jones on January 10, 2022, terminating any lease rights held by Entrust and Salman. However, Unrefined Oil presented an exhibit at trial indicating that in June 2021, Entrust and Salman had conveyed their respective working interests in the Well to Unrefined Oil.

As to Contango and Trapezoidal, the trial court entered an order granting Mr. Jones's motion for service by publication on January 10, 2022. The court noted that Trapezoidal did "not appear to exist, or to have ever existed in the State of Tennessee, pursuant to the records of the Secretary of State" and that Contango "appears to have existed in Tennessee at one time, but has been administratively dissolved for over seven (7) years." Unrefined Oil proceeded as the only defendant participating in this action.

Mr. Jones filed a "Motion to Allow Sale & Processing of Oil and Hold Funds" on November 29, 2021, requesting that the trial court allow him to sell the oil accumulated in the Well to Barrett with the proceeds either to be held by Barrett or in trust by the court. Mr. Jones also filed a motion to compel discovery from Unrefined Oil on the same day. In separate orders entered on January 10, 2022, the trial court granted Mr. Jones's motion to compel discovery but denied the motion to sell the oil accumulated in the Well. Subsequently, the trial court entered an agreed order on September 23, 2022, setting the case for trial and allowing the crude oil in the reserve tank of the Well to be picked up by Barrett for processing and sale with the net proceeds to be deposited with the clerk and master.

The trial court conducted a bench trial on January 10, 2023. In addition to his own testimony, Mr. Jones presented testimony from Peggy L. Allen, the managing officer of Outdoor Resources and widow of its founder, and Casey Allen, Ms. Allen's son who had been employed by Outdoor Resources. Unrefined Oil presented testimony from the owner-operator of Unrefined Oil, Brendon Scott Miller, who was also a former directional drilling engineer and well site supervisor, and Mr. Stephens, Unrefined Oil's employee.[3]

In a judgment entered on January 30, 2023, the trial court found in favor of Mr. Jones, declaring that the Amended Lease had "terminated, pursuant to its terms, for failure to comply with paragraph 7 of the lease in effect." The court specifically found that although "the well was pumped, in compliance with paragraph 7 of the amended lease, in 2020," Unrefined Oil had "failed to sell any oil for the one year following the implementation of the amended lease as also required by paragraph 7 of the lease in effect." The court thereby determined that "[a]s a result, the lease terminated on January 9, 2021 when no oil was sold and no payments were made." Unrefined Oil timely appealed.

---

[3] Throughout his testimony, Mr. Miller referred to Unrefined Oil as "Unrefined Oil Company, LLC," rather than Unrefined Oil Company, Inc. When Mr. Jones's counsel began to question Mr. Miller regarding the discrepancy, Mr. Miller maintained that the designation of "LLC" was correct. The trial court declined to entertain further questioning concerning the discrepancy. In its responsive pleadings before the trial court, Unrefined Oil maintained the moniker, Unrefined Oil Company, Inc. On appeal, Unrefined Oil has filed its pleadings as "Unrefined Oil Company, Inc. a/k/a Unrefined Oil Company, LLC," indicating that the two names refer to the same entity.

## II. Issues Presented

Unrefined Oil presents two overarching issues on appeal, which we have consolidated and restated as follows:[4]

1. Whether the trial court erred by allowing Mr. Jones to enforce the terms of the Amended Lease because Mr. Jones was the first to materially breach the Amended Lease by prematurely terminating it.

2. Whether this Court should remand the case to the trial court with instructions to (1) enter a judgment declaring that the Amended Lease is active, valid, and binding; (2) tax trial court costs to Mr. Jones; and (3) hold a hearing regarding further relief for Unrefined Oil.

Mr. Jones presents the following additional issue:

3. Whether the trial court erred by finding that Unrefined Oil pumped the Well in compliance with the Amended Lease.

## III. Standard of Review

Our review of the trial court's judgment following a non-jury trial is *de novo* upon the record, with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)). We review the trial court's conclusions of law, including its interpretation of a written agreement, *de novo* with no presumption of correctness. *See Ray Bell Constr. Co., Inc. v. State, Tenn. Dep't of Transp.*, 356 S.W.3d 384, 386 (Tenn. 2011); *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

---

[4] In its statement of the issues, Unrefined Oil has included more specific statements of the underlying arguments within its own overarching issues, and in its response to Mr. Jones's brief has done the same in relation to the additional issue raised by Mr. Jones. We do not find these detailed statements of the arguments within the issues necessary to include in the "Issues Presented" section.

IV.  Termination of Amended Lease

A.  Unrefined Oil's Breach of Contract Issue

Unrefined Oil contends that the trial court erred by failing to consider whether Mr. Jones committed the first material breach of the Amended Lease.  Unrefined Oil asserts that Mr. Jones committed a material breach by prematurely terminating the Amended Lease through allegedly (1) recording a "Notice of Lease Termination" with the Morgan County Register of Deeds prior to the expiration of the one-year term, (2) denying Unrefined Oil access to the Well before the lease had expired, and (3) tampering with and causing damage to the electrical system of the Well.  Mr. Jones responds that this action was one for declaratory judgment, rather than breach of contract, and that Unrefined Oil waived any breach of contract claim or affirmative defense of first material breach by failing to raise it in the trial court.  Upon thorough review of the record and applicable authorities, we conclude that although Mr. Jones initially alleged a breach of the Amended Lease, this action was tried by agreement as competing motions for declaratory judgment.  Unrefined Oil did not raise a breach of contract claim or a defense of first material breach.  We therefore determine that Unrefined Oil has waived its issue regarding first material breach on appeal.

Concerning review of whether a party has waived an issued by failing to raise it in the trial court, our Supreme Court has instructed:

> It is axiomatic that parties will not be permitted to raise issues on appeal that they did not first raise in the trial court.  *Barnes v. Barnes*, 193 S.W.3d 495, 501 (Tenn. 2006); *City of Cookeville ex rel. Cookeville Reg'l Med. Ctr. v. Humphrey*, 126 S.W.3d 897, 905-06 (Tenn. 2004); *see also* Tenn. R. App. P. 3, adv. comm'n cmt., subdiv. (e) (noting that "[f]ailure to present an issue to the trial court . . . will typically not merit appellate relief").  Parties invoking this principle have the burden of demonstrating that the issue sought to be precluded was, in fact, not raised in the trial court.  *Fayne v. Vincent*, 301 S.W.3d 162, 171 (Tenn. 2009).

> Determining whether parties have waived their right to raise an issue on appeal should not exalt form over substance.  Appellate courts must carefully review the record to determine whether a party is actually raising an issue for the first time on appeal.  *Fayne v. Vincent*, 301 S.W.3d at 171 n. 6.  The fact that the party phrased the question or issue in the trial court in a different way than it does on appeal does not amount to a waiver of the issue. *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d 141, 143 n.1 (Tenn. 2001) (noting that "the failure to use the right label does not result in a waiver").

*Powell v. Cmty. Health Sys., Inc.*, 312 S.W.3d 496, 511 (Tenn. 2010).

In his complaint, Mr. Jones requested declaratory judgment regarding the status of the Amended Lease and who had the right to operate the Well. The Tennessee Declaratory Judgment Act provides:

> Any person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status or other legal relations thereunder.

Tenn. Code Ann. § 29-14-103 (West 1923, to current). As this Court has explained:

> This statute "permits persons interested in a written contract to obtain a declaratory judgment concerning their rights, status, or other legal relations under the contract." *Dobbs v. Guenther*, 846 S.W.2d 270, 275 (Tenn. Ct. App. 1992). The statute is to be construed liberally, but the statute will only grant relief "to parties who have a real interest in the litigation . . . and when the case involves present rights that have accrued under presently existing facts." *Id.* (citations omitted).

*Whitworth v. City of Memphis*, ___ S.W.3d ___, ___, No. W2021-01304-COA-R3-CV, 2023 WL 2747075, at *11-12 (Tenn. Ct. App. Apr. 3, 2023).

In its answer, Unrefined Oil raised affirmative defenses of failure to state a claim upon which relief could be granted and unclean hands. In its counter-complaint, Unrefined Oil requested declaratory judgment that the Amended Lease was "active, valid and binding." Unrefined Oil also requested that the trial court enjoin Mr. Jones from interfering with the Amended Lease, allow Barrett temporary access to pick up the oil that was in the tank, hold proceeds from sale of the oil in trust, and award to Defendants "all costs associated with rewiring the oil off well and damages in an amount to be proven at trial." Unrefined Oil did not expressly state a claim for breach of contract or raise a defense of first material breach.

We note some confusion between the parties regarding whether Unrefined Oil is now asserting a breach of contract claim against Mr. Jones or raising first material breach as an affirmative defense. Mr. Jones correctly notes that first material breach is not one of the enumerated affirmative defenses provided in Tennessee Rule of Civil Procedure 8.03.

However, he asserts that it does constitute an affirmative defense to a breach of contract claim. *See Thompson, Breeding, Dunn, Creswell & Sparks v. Bowlin*, 765 S.W.2d 743, 744 (Tenn. Ct. App. 1987) ("An affirmative defense is one that wholly or partly avoids the cause of action asserted by the preceding pleading by new allegations that admit part or all of the cause of action, but avoids liability because of a legally sufficient excuse, justification, or other matter negating the alleged breach or wrong." (quoting LAWRENCE A. PIVNICK, TENNESSEE CIRCUIT COURT PRACTICE § 12:4 (2nd Ed. 1986))). This Court has previously noted a litigant's unopposed classification of first material breach as an affirmative defense. *See Kazemi v. Arab*, No. M2022-00707-COA-R3-CV, 2024 WL 851833, at *4 (Tenn. Ct. App. Feb. 29, 2024) (citing *Moore Freight Servs., Inc. v. Mize*, No. E2021-00590-COA-R9-CV, 2022 WL 325595, at *4 (Tenn. Ct. App. Feb. 3, 2022)). However, our research has not revealed Tennessee precedent expressly stating that first material breach is always an affirmative defense to a breach of contract action. Because we determine that neither party in this action pursued a breach of contract claim at trial, we find it unnecessary at this juncture to determine whether first material breach always constitutes an affirmative defense.

On appeal, Unrefined Oil essentially argues that its allegations in its counter-complaint constituted a claim of first material breach and that it is immaterial whether that allegation was an independent breach of contract claim or an affirmative defense to Mr. Jones's complaint. Specifically, Unrefined Oil alleged in its counter-complaint that Mr. Jones had "interfered with the oil and gas lease by harassing the operator and its employees who maintain and work on the well"; denied Mr. Stephens entry onto the property where the Well was located; and caused Barrett to refuse to pick up the oil in the face of a dispute. Unrefined Oil maintains that "it does not matter that these allegations were not denominated as an 'affirmative defense'" because Unrefined Oil's "pleading of the allegations as a counterclaim was sufficient" to assert that Mr. Jones had materially breached the Amended Lease.

Tennessee Rule of Civil Procedure 8.03 provides that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively facts in short and plain terms relied upon to constitute" various delineated affirmative defenses as well as "any other matter constituting an affirmative defense." Rule 8.03 further provides: "When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court, if justice so requires, shall treat the pleading as if there had been a proper designation." Unrefined Oil relies on this final sentence of the rule to urge that even though it did not specifically raise first material breach as an affirmative defense, its allegations against Mr. Jones provided notice that the issue of which party committed a first material breach of contract would be litigated at trial.

However, the primary relief sought by Unrefined Oil in its counter-complaint was a declaration that the lease was "active, valid and binding," not a determination that Mr. Jones had materially breached the Amended Lease. Regarding the importance of pleadings in giving notice to both the litigants and the trial court, this Court has explained:

> Pleadings give notice to the parties and the trial court of the issues to be tried. *Poster v. Andrews*, 182 Tenn. 671, 677, 189 S.W.2d 580, 582 (1943); *Hammett v. Vogue, Inc.*, 179 Tenn. 284, 290, 165 S.W.2d 577, 579 (1942). Providing this notice assists the parties in preparing for trial and also assists the trial court in focusing on the matters that are at issue. The failure to assert a claim or defense in a timely manner is generally deemed to amount to a waiver of the right to rely on the claim or defense at trial. *See Steed Realty v. Oveisi*, 823 S.W.2d 195, 197 (Tenn. Ct. App. 1991) (statute of limitations defense deemed waived when not timely asserted in the proper manner); *Thompson, Breeding, Dunn, Creswell & Sparks v. Bowlin*, 765 S.W.2d 743, 744 (Tenn. Ct. App. 1987) (affirmative defenses deemed waived because they were not asserted in the answer); Tenn. R. Civ. P. 12.08.

*Castelli v. Lien*, 910 S.W.2d 420, 429 (Tenn. Ct. App. 1995). We determine that Unrefined Oil's counter-complaint did not provide notice to Mr. Jones or the trial court that a breach of contract claim against Mr. Jones was at issue.

Unrefined Oil also argues that breach of contract was tried by implied consent, particularly whether Mr. Jones was the first to materially breach the Amended Lease. Tennessee Rule of Civil Procedure 15.02 creates an exception to the general rule that "[j]udgments awarded beyond the scope of the pleadings are void." *See Randolph v. Meduri*, 416 S.W.3d 378, 384 (Tenn. Ct. App. 2011) (footnote omitted). Rule 15.02 provides in pertinent part:

> Amendments to Conform to the Evidence.—When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

"Generally speaking, trial by implied consent will be found where the party opposed to the amendment knew or should reasonably have known of the evidence relating to the new issue, did not object to this evidence, and was not prejudiced thereby." *Hiller v. Hailey*, 915 S.W.2d 800, 804 (Tenn. Ct. App. 1995) (quoting *Zack Cheek Builders, Inc. v. McLeod*,

597 S.W.2d 888, 890 (Tenn. 1980)). As this Court has explained, "[t]rial by implied consent is not shown by the presentation of evidence that is relevant to an unestablished issue when that evidence is also relevant to the established issue." *Christmas Lumber Co. v. Valiga*, 99 S.W.3d 585, 593 (Tenn. Ct. App. 2002) (quoting *McLemore v. Powell*, 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997)). "The determination of whether there was implied consent rests in the discretion of the trial judge, whose determination can be reversed only upon a finding of abuse." *Zack Cheek Builders, Inc. v. McLeod*, 597 S.W.2d 888, 891 (Tenn. 1980).

Unrefined Oil has a particularly difficult hurdle to overcome in arguing implied consent because Unrefined Oil's trial counsel announced clearly at the beginning of trial that this was not a breach of contract case. When the trial court inquired whether the parties wished to make opening statements, the following exchange ensued:

| | |
|---|---|
| Mr. Jones's Counsel: | No. Your Honor, actually, I think from pretrial discussions, you understand there's a lot of oddities and bends and twists you're going to have to sort out for us. I don't know that it would be of much benefit to rehash it. |
| Unrefined Oil's Counsel: | Your Honor, I just want to make it clear what we're here for. Of course, you read it. But <u>we're not here on a breach of contract case</u>. We're here to determine, you know, if this lease is valid, that's what – or still in effect. So that's all my opening would be. So you're fully aware of that. |
| Trial Court: | That's my understanding. <u>It's a declaratory judgment action to determine the validity of a lease</u>. |
| Unrefined Oil's Counsel: | <u>Yes, Your Honor</u>. |
| Trial Court: | I guess the gist of it is whether or not that lease has been terminated. Is that the central – |
| Mr. Jones's Counsel: | I think that's the issue. |
| Trial Court: | – the crux of the case? |
| Mr. Jones's Counsel: | Yes, Your Honor. |

(Emphasis added.)[5] During this exchange, the parties' respective counsel agreed that they were trying a declaratory judgment action, not a breach of contract action, despite Mr. Jones's initial allegation in his complaint that Unrefined Oil had breached the Amended Lease.

Throughout the proceedings, the trial court continued to treat this case as a declaratory judgment action, stating in its final judgment that the action was before the court "upon a Petition for Declaratory Judgment." Concerning the requirements of paragraph seven of the Amended Lease, the court found that Unrefined had pumped the Well but had "failed to sell any oil for the one year following the implementation of the amended lease." The court thereby found that the Amended Lease had "terminated, pursuant to its terms, for failure to comply with paragraph 7 of the lease in effect." Apart from taxing costs to Unrefined, the court did not award any relief other than its declaration, as Mr. Jones had requested, that the Amended Lease had terminated on its own terms.

In reaching this decision, the trial court considered evidence presented by Unrefined Oil regarding, *inter alia*, Mr. Jones's actions of filing the notice of termination, telling Mr. Stephens he would prefer that Mr. Stephens did not visit the Well, and rewiring the electricity to the Well. Although this evidence may well have been relevant to a breach of contract claim or defense if one had been asserted by Unrefined Oil, it was also relevant to the parties' competing claims for declaratory judgment. The trial court found that the Amended Lease had terminated on its own terms because Unrefined Oil had not sold any oil in the one-year period. Mr. Jones had also asserted in his complaint that the Amended Lease terminated on its own terms because production had ceased for at least ninety days. Whether Mr. Jones's actions had prevented Unrefined Oil from maintaining production in the Well or selling oil was relevant to a determination of whether the Amended Lease had terminated on its own terms or was still valid, *i.e.*, the competing declaratory judgment claims. The implication in hindsight that it would have also been relevant to a breach of contract claim or defense presented by Unrefined Oil does not render a breach of contract claim or defense tried by implied consent when Unrefined Oil did not present one. *See Christmas Lumber Co.*, 99 S.W.3d at 593 ("Trial by implied consent is not shown by the presentation of evidence that is relevant to an unestablished issue when that evidence is also relevant to the established issue." (quoting *McLemore v. Powell*, 968 S.W.2d 799, 803

---

[5] Following oral argument before this Court, Unrefined Oil filed a "letter of supplemental authority," attaching a copy of the transcript page containing the exchange quoted above. Mr. Jones filed a letter objecting to Unrefined Oil's letter as not in compliance with Tennessee Rule of Appellate Procedure 27(d) regarding citation of supplemental authorities. This Court subsequently entered an order deferring the parties' post-argument letters to be addressed in this Opinion. Having determined that Unrefined Oil's letter contains no citations to supplemental authorities as anticipated by Rule 27(d) and noting that the transcript page presented is in the appellate record, we hereby sustain Mr. Jones's objection and will not consider Unrefined Oil's letter of supplemental authority.

(Tenn. Ct. App. 1997))). Upon careful review, we determine that breach of contract was not tried by implied consent in this matter.

In a recent decision, this Court considered whether the trial court had erred in dismissing the appellants' declaratory judgment claim when the appellee argued that it was "merely duplicative" of other claims that had been dismissed on other grounds, including a breach of contract action. *See Whitworth*, ___ S.W.3d at ___, 2023 WL 2747075, at *12. Having held that no enforceable contract had been created between the parties, this Court determined that the appellants' declaratory judgment action, wherein they sought "a declaration that they [had] a contract with [the appellee]" and an explanation of the parties' rights and status, had been properly dismissed because it had been resolved by the dismissal of the breach of contract action. *Id.* In the case at bar, both Mr. Jones and Unrefined Oil chose at trial to pursue a declaratory judgment action to establish whether the Amended Lease remained in effect and the respective status of the parties in relation to the Amended Lease. Neither party chose to pursue a breach of contract claim, which, as in *Whitworth*, would have rendered their declaratory judgment claims improperly duplicative. *See id.*

For these reasons, we determine Unrefined Oil's breach of contract claim and assertion that Mr. Jones committed the first material breach of the Amended Lease to have been waived because neither the claim nor the defense was raised in the trial court or tried by implied consent. *See Powell*, 312 S.W.3d at 511 ("It is axiomatic that parties will not be permitted to raise issues on appeal that they did not first raise in the trial court.").

### B. Amended Lease Terminated by Its Own Terms

In its second issue on appeal, Unrefined Oil contends that it is "entitled to a judgment that the Amended Lease is active, valid and binding," urging this Court to reverse the declaratory judgment granted in favor of Mr. Jones and grant the declaratory judgment sought by Unrefined Oil. In great part, Unrefined Oil's argument within this issue is, as above, premised on a breach of contract theory and is therefore waived. However, Unrefined Oil also argues that the trial court erred by finding that the Amended Lease had terminated by its own terms. Mr. Jones responds that because none of his actions prevented Unrefined Oil from selling oil pursuant to the requirements of the Amended Lease, the trial court properly found that the Amended Lease had terminated per its own provisions. Upon careful review, we determine that the evidence does not preponderate against the trial court's findings that the Amended Lease terminated because Unrefined Oil did not sell oil within a year's time as required by paragraph seven of the Amended Lease.

As this Court has explained regarding interpretation of an oil and gas lease:

- 14 -

An oil and gas lease, as any other contract, is interpreted using the rules of construction. *See Waddle v. Lucky Strike Oil Co.*, 551 S.W.2d 323, 326-27 (Tenn. 1977). A lease should be considered in its entirety, and it is construed according to the plain meaning of the language used unless the language is ambiguous. *Cali-Ken Petroleum Co., v. Slaven*, 754 S.W.2d 64, 65 (Tenn. Ct. App. 1988). ". . . [T]he court seeks to ascertain the intention of the parties from the language used." *Waddle*, 551 S.W.2d at 326. Nonetheless ". . . if disputed language in a contract is ambiguous, or uncertain, it will be construed most strong against the author." *Dunn v. United Sierra Corp.*, 612 S.W.2d 470, 473 (Tenn. Ct. App. 1980).

*Lone Star Oil & Gas, Inc. v. Howard*, No. E2009-00428-COA-R3-CV, 2010 WL 520934, at *3 (Tenn. Ct. App. Feb. 12, 2010).

Primarily at issue is paragraph seven of the Amended Lease ("Paragraph Seven"), which provides:

IF production shall cease for more than Ninety (90) Days, this lease shall terminate unless the LESSEE is commencing operations for drilling, reworking, treating or deepening the well. In that case, LESSOR shall be notified and the work shall be completed within Ninety (90) days from the date of such cessation for that work identified, and this lease shall remain in force during the prosecution of such additional drilling, reworking, treating or deepening. Production shall promptly resume after the work is completed and this lease shall continue in effect. If this lease terminates due to a failure to continue production as set out above, then all improvements to the Well site shall remain on site for the benefit and responsibility of LESSOR.

In addition to the Well remaining in production, the Well shall produce a minimum of one sale of crude oil per year to continue the lease and LESSOR shall receive payment on oil sold within Ninety (90) days of oil pick-up.

In the event the owners/operators decide to discontinue the Well and plug same, Landowner shall be notified, in writing, and Landowner shall have Ninety (90) days from said written notice to take over the Well and its operation. If Landowner does not do so, the owner/operator may plug the well and this lease will terminate.

(Emphasis added.)

In its final judgment, the trial court made the following specific findings of fact and conclusions of law:

1.  The original lease to the property at issue was terminated by the amended lease.

2.  That the amended lease took effect on January 9, 2020.

3.  Upon transfer of interest to well permit #12271, [Unrefined Oil] timely applied for permits and bond, and has no fault for the State's failure to timely process the application.

4.  That the well was pumped, in compliance with paragraph 7 of the amended lease, in 2020.

5.  That [Unrefined Oil], however, failed to sell any oil for the one year following the implementation of the amended lease as also required by paragraph 7 of the lease in effect.

6.  That the lease entered does not make any provision as to price, market conditions, or other factors that would relieve this obligation.

7.  The fact that the assignment of the lease was made to [Unrefined Oil] later in January 2020 would not alter the requirements of the lease to make this sale.

8.  Even though the covid pandemic at that time did interfere with business activities that year, there was no evidence presented to the Court that shows that crude oil could not be sold the entire year to comply with the contract terms.

9.  As a result, the lease terminated on January 9, 2021 when no oil was sold and no payments were made.

(Emphasis added.)

Under Paragraph Seven, the lease terminated if production ceased for more than ninety days unless the cessation was due to "operations for drilling, reworking, treating or deepening" the Well. Although Mr. Jones alleged in his complaint that production had ceased, the trial court found that production had continued.[6] However, Paragraph Seven also provides that "the Well shall produce a minimum of one sale of crude oil per year to

---

[6] We will address the trial court's finding regarding production, raised as an issue by Mr. Jones, more fully in a subsequent section of this Opinion.

continue the lease" with Mr. Jones receiving payment for the oil within ninety days of its pick-up. The trial court found that the oil sale requirement had not been met and that the Amended Lease did not provide for factors that would relieve the sale requirement.

Mr. Jones relies in part on this Court's decision in *Lone Star Oil* for the proposition that a lease may terminate according to its own terms "for nonperformance of certain conditions" expressly provided in the lease. *See Lone Star Oil*, 2010 WL 520934, at *4 (citing *Waddle v. Lucky Strike Oil Co.*, 521 S.W.2d 323, 327 (Tenn. 1977)). We agree that the *Lone Star Oil* decision is applicable to this case. In *Lone Star Oil*, this Court affirmed the trial court's judgment declaring that an oil and gas lease had "terminated by its own terms," rejecting the lessee's argument that the lessor was required to give notice of default. *Lone Star Oil*, 2010 WL 520934, at *4 ("Lessee's failure to produce oil or gas from the well or tender rental or royalty payments to Lessor for four months led to the termination of the Lease by its own terms."). The *Lone Star Oil* Court noted our Supreme Court's explanation in *Waddle v. Lucky Strike Oil Co.*, 551 S.W.2d 323, 327 (Tenn. 1977), that "if the conditions expressly provided to avoid termination are not performed, then termination is the result . . . ." *Id.*

At the outset, it is important to pinpoint the one-year period during which the sale of oil was required to occur. The trial court expressly incorporated the transcript of its oral ruling into its written judgment. Within its oral ruling, the court found that the one-year period for compliance with the oil-sale requirement began on January 9, 2020, and ended on January 9, 2021. Mr. Miller testified that he thought Unrefined Oil had until a year following his January 22, 2020 assumption of interest in the Amended Lease to comply with the sale requirement. However, it is undisputed that the one-year term remained the same upon assignment to Unrefined and therefore began on January 9, 2020, the date the Amended Lease was executed. *See Collier v. Greenbrier Developers, LLC*, 358 S.W.3d 195, 201 (Tenn. Ct. App. 2009) ("Following an effective assignment, it is well settled that the assignee stands in the shoes of the assignor and has all the rights, and is subject to all the obligations, of the assignor."). In his responsive brief on appeal, Mr. Jones maintains that the ending date for the one-year term should have been January 8, 2021, at midnight, rather than January 9, 2021. We agree. *See Norton v. McCaskill*, 12 S.W.3d 789, 791 (Tenn. 2000) (determining that when a lease began on July 1, 1985, and included a provision requiring the lessee to exercise an option to renew "at the end of" a ten-year term, the last day to renew the lease was June 30, 1995). Upon review, we determine that the one-day difference in calculation of the term made by the trial court did not substantively affect the court's ruling and therefore constituted harmless error.

Unrefined Oil contends that Mr. Jones's purported actions of (1) recording a lease termination notice, (2) denying Unrefined Oil access to the Well, and (3) tampering with the electrical system "made it impossible" for Unrefined Oil to perform the sale

requirement. We will address the effect of each of these actions on sale of the oil within the requisite time period in turn.

First, Mr. Jones executed a notice of lease termination on December 3, 2020, which he recorded with the Morgan County Register of Deeds on December 18, 2020. In the notice, Mr. Jones stated in pertinent part:

> WHEREAS, the well has been out of production for more than Ninety (90) days and more than One Hundred Eighty (180) days and further there has been no notice of drilling, reworking, treating or deeping of well and no activity at the well site including, but not limited to, drilling, reworking, treating or deeping of the well in the last six (6) months, or at any time in 2020; NOW

> THEREFORE, the Lessee having failed to perform, the lease has terminated pursuant to its own terms, and to the extent it may be required Lessor affirms the termination of the Lease Agreement and shall assume operation of the well.

Unrefined Oil argues that in filing the notice, Mr. Jones "unilaterally terminated" the Amended Lease prior to expiration of the one-year term and for cessation of production, a reason not found by the trial court.

Unrefined Oil attempts to distinguish the circumstances here from those in cases such as *Waddle*, 551 S.W.2d at 327, and *Lone Star Oil*, 2010 WL 520934, at *4, wherein the leases were found to have terminated upon their own terms, by asserting that Mr. Jones terminated the Amended Lease before it could terminate upon its own terms. We find this argument unavailing. Mr. Jones expressly stated in the notice that the Amended Lease had "terminated pursuant to its own terms" based on his belief that the Well had been out of production for at least ninety days. Therefore, Mr. Jones's filing served as a notice of his belief that the Amended Lease had self-terminated rather than as a unilateral termination.

Moreover, the evidence presented demonstrates that Mr. Jones's notice of termination did not prevent Unrefined Oil from selling oil during the one-year timeframe. Mr. Miller testified that he conducted a "health check" of the Well without any interference from Mr. Jones on December 23, 2020, five days after Mr. Jones had recorded the notice of termination. Mr. Miller further testified that he did not learn about the notice of termination until January 8, 2021, the date he visited the property where the Well was located and spoke to Mr. Jones. Although Mr. Miller testified that Barrett would not pick up oil if a dispute existed over who had the authority to operate the Well, there is no indication in the record that Barrett had been informed prior to January 8, 2021, that a

- 18 -

dispute had arisen or that Unrefined Oil had contacted Barrett prior to that date regarding a pick-up.

Second, Mr. Jones acknowledged in his testimony that he had told Mr. Miller that Mr. Miller was no longer welcome on the Well property and that he subsequently told Mr. Stephens that he would prefer that Mr. Stephens not visit the Well. However, the first conversation between Mr. Jones and Mr. Miller undisputedly occurred on January 8, 2021, which was the last day of the one-year period provided for Unrefined Oil to make at least one sale of oil under Paragraph Seven. Mr. Stephens testified that he attempted to "check" the Well and was turned away by Mr. Jones on what he thought to be January 13, 2021. Although Mr. Jones maintains on appeal that Mr. Miller was still able to access the Well "without harassment" on January 8, 2021, and Mr. Miller acknowledged that he had gone to the property and Mr. Jones's home on that date, it is understandable that Mr. Miller would have hesitated to act against Mr. Jones's desire, expressed on January 8, 2021, that Mr. Miller stay off the property. Importantly, however, there is no indication in the record that if Mr. Miller had been allowed completely unfettered access to the Well on January 8, 2021, he would have suddenly arranged a sale of oil before the one-year term expired at day's end.

Finally, concerning electricity to the Well, Ms. Allen testified that she had paid the electric bill related to the Well for years, in her capacity as managing officer of Outdoor Resources, but that she had then asked her son to disconnect the electricity to the Well after assigning her interest in the Well to Defendants. Her son explained that he had disconnected the electricity to the Well in approximately April 2020. Mr. Jones testified that after he discovered the Well was not pumping due to a lack of electricity, he connected a generator to the Well so that he could operate the pump and provide gas heat to his sister's home located on the land. There was some confusion regarding dates in Mr. Jones's testimony, but he eventually clarified for the trial court, as Mr. Jones summarizes his brief, that "he thought the pump was shut off in April or May and did not operate until he pumped it in about November" of 2020. Mr. Miller related that when he attempted to have an electrician from Plateau Electric Cooperative "fix" the electricity to the Well in January 2021, the electrician refused, which prompted Mr. Miller's visit to the site on January 8, 2021.

Although Unrefined Oil characterizes Mr. Jones's actions regarding the electricity to the Well as "tampering," and although these actions may have caused difficulty following the expiration of the one-year term for a sale of oil, Mr. Miller's testimony indicated that the Well was pumping each time he performed a health check in March, July, and December of 2020. Significantly, Mr. Miller did not visit the Well to investigate what had occurred with the electricity until the last day of the one-year period on January 8, 2021. Furthermore, as Mr. Jones points out, Mr. Miller testified that he did not sell oil

during the relevant timeframe because (1) the price was too low; (2) he thought he had until January 22, 2021, to sell the oil; and (3) he was not approved by the State of Tennessee as the owner/operator of the Well until January 11, 2021. As to this last reason, the trial court found that the delay in Mr. Miller's state authorization as owner/operator was due to a delay with the State of Tennessee's processing of Mr. Miller's application and was not Unrefined Oil's fault. Nonetheless, as the trial court also found, Paragraph Seven provides for no extenuating circumstances in requiring at least one sale of oil within a one-year term.

We therefore determine that the evidence preponderates in favor of the trial court's conclusion that the Amended Lease had terminated pursuant to its own terms. The trial court did not err by granting declaratory judgment in favor of Mr. Jones. Unrefined Oil is not entitled to relief on this issue.

## V. Production in Compliance with Paragraph Seven

Mr. Jones has raised an issue challenging the trial court's finding that Unrefined Oil pumped the Well in compliance with Paragraph Seven. If this finding were reversed, it would not only constitute an additional basis for concluding that the Amended Lease terminated pursuant to its own terms, but it would also invoke the provision of Paragraph Seven that "[i]f this lease terminates due to a failure to continue production as set out above, then all improvements to the Well site shall remain on site for the benefit and responsibility of [Mr. Jones]." Due to the latter contingency, the issue remains justiciable despite our conclusion above that the Amended Lease terminated pursuant to the provision requiring an oil sale. *See City of Memphis v. Hargett*, 414 S.W.3d 88, 96 (Tenn. 2013) ("The role of our courts is limited to deciding issues that qualify as justiciable, meaning issues that place some real interest in dispute, and are not merely 'theoretical or abstract.'" (quoting *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 203 (Tenn. 2009)) (additional internal citation omitted).

Mr. Jones asserts that the trial court's finding concerning the pumping of the Well was conclusory and constituted an insufficient finding of fact. *See* Tenn. R. Civ. P. 52.01 ("In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment."). Unrefined Oil responds that the trial court's finding on this issue was specific, factual, and supported by the evidence presented at trial. Following our thorough review of the record and the trial court's judgment, we conclude that the court made sufficient findings of fact regarding the pumping of the Well and whether it was in production in compliance with Paragraph Seven. Furthermore, given that Mr. Jones's argument concerning this issue is based primarily on whether the trial court properly credited witnesses' respective testimonies, we discern no reason to disturb the presumption that the trial court's factual findings were correct, *see Rogers*, 367 S.W.3d at 204, or the respective

credibility afforded to witnesses' testimonies by the trial court, *see Morrison*, 338 S.W.3d at 426.

At issue is the provision of Paragraph Seven stating: "IF production shall cease for more than Ninety (90) Days, this lease shall terminate unless the LESSEE is commencing operations for drilling, reworking, treating or deepening the well." It is undisputed that Unrefined Oil was not drilling, reworking, treating, or deepening the Well at any time in 2020. Paragraph four of the Amended Lease states in pertinent part that "[f]or the Well to be in production, it must be <u>actually operating to pump oil</u> from the ground to the storage tank" (emphasis added). Unrefined Oil argues that the trial court's finding regarding production indicates that the court credited Mr. Miller's testimony that each time he conducted a "health check" on the Well in 2020, which he testified he did on March 1, July 3, and December 23, he found that the amount of oil in the Well had increased. Mr. Miller also testified that each time he conducted a health check, the electricity to the Well was working. Mr. Jones questions the credibility of Mr. Miller's testimony regarding the electricity to the Well.

The trial court did not make any express findings regarding the credibility of witnesses. However, we agree with Unrefined Oil's point that the trial court's finding concerning the pumping of the Well indicates the court's implied acceptance of Mr. Miller's testimony in this regard. As to his background, Mr. Miller testified that he had previously been employed as a directional drilling engineer for a large oil field services company and as a well site supervisor and a productions and completions supervisor for an energy company operating in several states. He reported that when he had performed "health checks" on the Well in March, July, and December of 2020, the Well was pumping each time.

According to Mr. Miller, when he checked the Well on March 1, 2020, it was in production, and he pumped and gauged it, measuring "49 inches of oil in the storage tank" roughly equal to "60 barrels of oil." Mr. Miller stated that when he checked the Well on July 3, 2020, he performed "a full inspection of the pump jack, and all the production components, and . . . a full inspection of the 220-barrel oil tank." He reported that he had "gauged the oil storage tank and . . . gauged the oil in the well to be at 90 inches, roughly 110 barrels of oil." Mr. Miller explained that in July 2020, the lock that Mr. Allen had placed on the Well's electric box did not stop Mr. Miller from pumping the Well because he "manually forced a pump, which is something that is adjacent to the actual time to click, that you can actually turn on." Mr. Miller further testified that during the December 23, 2020 health check, he "could see that the well had been tampered with, the time box had been bypassed, and the electricity had been illegally hooked up to Marena Rhonda Paxton's mobile home." He maintained, however, that the Well "was pumping" and that "the amount of oil in the tank had risen since health check No. 2 by 41 inches, to roughly 160

barrels of oil in the well." Mr. Miller summarized that "[t]he well was pumping and producing oil in 2020." During Mr. Miller's testimony, Unrefined Oil presented photographic documentation of each health check.

Mr. Jones relies on Unrefined Oil's response to a particular request for admission that was presented within a set of responses as an exhibit at trial. Unrefined Oil had responded with "Admit" in response to the following request:

> Please admit or deny that the only time the well pump on well permit #12271 was not observed pumping was on the second well health check #2, occurring on July 3, 2020.

When questioned on cross-examination regarding this admission, Mr. Miller stated:

> I assumed that he was saying that we did – that basically was the well pumping or was it not pumping. I say it was pumping. We did pump it on July 3rd, 2020.

Mr. Jones urges that because Unrefined Oil did not file a motion to withdraw or amend the admission, pursuant to Tennessee Rule of Civil Procedure 36.02, Unrefined Oil's admission must be taken as conclusive proof that the Well was not pumping on July 3, 2020. *See* Tenn. R. Civ. P. 36.02 ("Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission.").

Setting aside Mr. Miller's attempted clarification of the admission, we find a flaw in Mr. Jones's assumption that if Mr. Miller did not observe the Well pumping on July 3, 2021, the Well necessarily was not producing for at least a ninety-day period. As Unrefined Oil points out, Mr. Miller "testified that he knew the well had pumped between March 1, 2020 and July 3, 2020 because the amount of oil in the storage tank had increased '[c]onsiderably.'" Although the Allens testified to blocking the electricity to the Well and Mr. Jones testified to utilizing a generator to pump the Well so that he could obtain gas for his sister's mobile home, the trial court clearly credited Mr. Miller's testimony that he was able to activate the pump manually and that his measurements of the Well evinced no cessation of production. We determine that the evidence does not preponderate against the trial court's finding that "the well was pumped, in compliance with paragraph 7 of the amended lease, in 2020."

## VI.  Conclusion

For the foregoing reasons, we affirm the trial court's judgment in its entirety.  We remand this matter to the trial court for enforcement of the judgment and collection of costs assessed below.  Costs on appeal are assessed one-half to the appellant, Unrefined Oil Company, Inc., and one-half to the appellee, Jackie L. Jones.


s/ Thomas R. Frierson, II_____
THOMAS R. FRIERSON, II, JUDGE